Victor **MELENDEZ**, Petitioner,

v.

**SUPERINTENDENT, CLINTON CORRECTIONAL FACILITY,**
Respondent.

No. 75 C 113.

United States District Court,
E. D. New York.

July 10, 1975.

Frederick H. Cohn, New York City, for petitioner.

Rhonda A. Bayer, New York City (Louis J. Lefkowitz, Atty. Gen., of counsel), for respondent.

## MEMORANDUM and ORDER

DOOLING, District Judge.

The petitioner seeks habeas corpus on the ground of the failure of the prosecution to disclose the name of an informer allegedly present at the two sales of heroin for which petitioner was indicted and convicted, and on the ground of the failure of the trial judge to compel disclosure of the informer's name. The petition is very nearly a copy of the statement of the facts and evidence and the argument of Point One made on petitioner's appeal of his conviction to the Appellate Division, Second Department.

The two sales of heroin involved were allegedly made by Petitioner to undercover Detective Richard Marcus on March 1 and March 18, 1971. Petitioner was arrested on March 18, 1971, went to trial on October 2–4, 1972, and was convicted, and he was sentenced on December 12, 1972, to a maximum term of 7 years.

On his appeal to the Appellate Division the judgment of conviction was unanimously affirmed without opinion on September 19, 1974 (45 App.Div.2d 990, 359 N.Y.S.2d 997). Leave to appeal to the Court of Appeals was denied on November 18, 1974, (34 N.Y.2d 950, 359 N.Y.S.2d 565, 316 N.E.2d 878).

The undercover detective testified that on March 1 he bought 4 foil packets of white powder from Petitioner for twelve dollars and that he was accompanied by another person (Tr. 29) who introduced Detective Marcus to the Petitioner as "Victor" (Tr. 49). On March 18, 1971, Detective Marcus, again in company of the same "other person," met the Petitioner and bought four more foil packets containing a white powder for twelve dollars (Tr. 38–39). At this point the testimony was:

"Q And this other person was he present during the purchases on March 1st and March 18, 1971?

"A He was present, I would say, up to a point. He was not present—

"Q At the point of the transaction—

"A At the point of the transaction, he was not present."

\* \* \* \* \* \*

"THE COURT: He didn't stay there?

"THE WITNESS: He didn't stay there for the transaction." (Tr. 39).

Defense counsel asked Detective Marcus whether he had informants who worked with him and Detective Marcus said that he did from time to time. When defense counsel asked whether they were narcotics addicts, the Court sustained an objection and sustained further objections when the question was made specific as to the person who introduced Detective Marcus to Petitioner (Tr. 61). Defense counsel brought out that Petitioner had no one with him at the time of the alleged transactions, and at that point the examination continued in this way (Tr. 70):

"Q You say that the person who brought you up to introduce you to

this man came with you, is that correct?

"A Was present up to a point, yes.

"Q What point?

"A Prior to the transaction?

"Q That happened in both instances, did it not?

"A Yes.

"Q Did you tell him to leave?

"A Well, I have prearranged informants which I utilize with various persons that I may be with.

"Q Wouldn't this person with respect to at least March 1st, have to introduce you to this man and talk about narcotics?

"THE COURT: Not did he introduce you to him?

"THE WITNESS: Yes.

"THE COURT: Did he talk about narcotics?

"THE WITNESS: Yes. We had a conversation.

"Q Was that conversation related to the sale of narcotics?

"A Yes.

"Q And who was that person?

Mr. Sussman: Objection.

"THE COURT: The name of the person? The objection is sustained.

Mr. Brackly: He may be a witness.

"THE COURT: The objection is sustained.

"Q Do you know the person?

Mr. Sussman: I will object to the entire line of questioning.

"THE COURT: I will let him ask the question.

Do you know that person?

"THE WITNESS: Do I know who that person is?

"Q Yes.

"A Yes.

"Q Is that person a registered informant?

"A Yes.

Mr. Brackly: Now, may I have his name?

Mr. Sussman: Objection.

"THE COURT: Objection sustained.

"Q With respect to the second transaction on March 18th, what was the purpose of the so-called registered informant being present at that time?

Mr. Sussman: Objection.

"THE COURT: What was the purpose of his being present? Objection overruled.

"THE WITNESS: He may have been present at that time. I would have to recollect my memory but he may have been present for other transactions that I was attempting to make. His purpose was to introduce me to people in the area.

"Q Did you not testify in direct examination a few moments ago that he came with you on both occasions?

"THE COURT: That was on cross-examination.

Mr. Brackly: I thought that it was direct.

"THE COURT: Your examination. Go ahead.

Parenthetically, the recollection of counsel rather than that of the Court appears to have been correct (Tr. 39).

"Q That he came to you or with you on both occasions just prior to the so-called transaction he left?

"A Yes, I had testified.

"Q Is your memory now unclear with respect to that insofar as the second incident is concerned?

"A The same thing transpired. He was with me. He was present to a point and left.

"Q What I asked you was why on the second occasion would he have to accompany you?

"THE COURT: He has answered that. He said that he was there. They were making other contacts.

"THE WITNESS: We were attempting to do other things.

"Q Did you do anything else that day"

"A I would have to look at my memo book." (Tr. 70–74)

Petitioner was arrested fifty-five minutes after the second "buy" according to Detective Marcus.

The circumstances of the second alleged sale were given in this form by Detective Marcus (Tr. 78–80):

"THE COURT: How did he [Detective Marcus] meet him [Petitioner] at 2:05?

"THE WITNESS: We were in the area.

"THE COURT: When you say we, you mean you and your informant?

"THE WITNESS: Yes.

"THE COURT: You were in the area?

"THE WITNESS: Yes.

"THE COURT: Walking around?

"THE WITNESS: That's correct.

"THE COURT: And you saw him?

"THE WITNESS: That's correct.

\*   \*   \*   \*   \*   \*

"THE COURT: Did you, after buying the first four packets, make a date to meet him at some other time?

"THE WITNESS: No, sir.

"Q Then I take it that you expected to just run into him as a coincidence again on South Third Street?

"A Yes.

"Q And that is what happened on the 18th?

"A Correct.

"Q And on the 18th he just happened to have four packets of whatever you said that he had?

"THE COURT: The objection is sustained. This is argumentative. You don't know how he happened to have any packets with him.

"THE WITNESS: No, I wouldn't know that."

Detective Marcus also testified that defendant had a small tattoo on the back of his left hand where his index finger met his thumb in the shape of a bird or something like that (Tr. 87).

There were two back-up detectives on assignment with Detective Marcus. Detective Charles Petkiewitz testified to observing Detective Marcus in conversation with Petitioner (Tr. 99) on March 1st and that after that Detective Marcus walked one way and the Petitioner another way. Later on the same day Detective Petkiewitz met Detective Marcus, was shown four tin foil packets by Detective Marcus, and joined him in sealing the four packets into an evidence envelope (Tr. 99–101). He testified further that on March 18th he again observed Detective Marcus in conversation with Petitioner for a couple of minutes, and afterwards, was shown four tin foil packets by Detective Marcus, and joined him in putting them into an evidence envelope and then endorsing it (Tr. 102–103). He testified that he and Patrolman Bernstein arrested Petitioner fifty-five minutes later one block from the scene of the alleged conversation between Detective Marcus and Petitioner. When Petitioner was searched he had no money on him and no drugs (Tr. 106–107).

Detective Petkiewitz said that Patrolman Bernstein, Detective Marcus and he met with the confidential informant on March 1 before Detective Marcus and the informant went to the location and that after Detective Marcus reached the place of the alleged March 1 sale (Tr. 113)

"He [Detective Marcus] was on the corner . . . in conversation with a male.

"Q Who else?

"A With the C.I.

"Q With the confidential informant? What happened then?

"A They stayed there a short time and then they left.

"Q Who left?

"A Everybody.

"Q What do you mean everybody?

"A All three.

"Q   All three left at the same time?

"A.   Thereabouts.   I don't recall exactly how they left.

"Q   You were there, weren't you?

"A   I saw them."

On further cross-examinataion Detective Petkiewitz said (Tr. 115)

"Q   How did they leave, was it one at a time, or two together or one?

"A   I don't recall.   They might have all walked up the same block.   I don't know.   They disappeared  .  .  .  .

"Q   In other words, you did not see Melendez until you saw all three together?

"A   I believe so.

\*     \*     \*     \*     \*     \*

"Q   I take it from what you say that you did not have a predetermined meeting with Melendez through your confidential informant?

"A   No sir."

Detective Petkiewitz testified as to the March 18th episode (Tr. 118):

"Undercover agent along with a confidential informant was on South 4th and Hooper and we were in our position and the same thing occurred. They allegedly had a conversation .  .  .  in close proximity to each other."

\*     \*     \*     \*     \*     \*

"Q   Then what?

"A   Then they left the scene.

"Q   How?

"A   Different ways.

"Q   Meaning what?

"A   I don't know which way.

\*     \*     \*     \*     \*     \*

"Q   Again do you remember in what manner.   Did somebody go first, second or third?

"A   I don't recall."

Asked whether the confidential informant stayed throughout, Detective Petkiewitz answered (Tr. 120)

"I don't recall.   Usually the confidential informant would walk off to the side while a transaction is taking place between the defendant and the undercover agent."

"THE COURT:   Go ahead.

"Q   What happened in this case?

"A   I don't recall."

Patrolman Bernstein similarly testified to observing the undercover detective in conversation with Petitioner on March 1 and on March 18, 1971, and that on each occasion after some coversation they broke up and went their separate ways.   Patrolman Bernstein testified (Tr. 146) that on March 1st he saw the undercover officer in conversation with the Petitioner, that there were three people, that he could not see what they did other than that they were standing in conversation, and that they walked and then they split up; he also testified that on March 18th he saw the informant and Detective Marcus walking together with Petitioner, that he did not have a recollection of the confidential informant walking away and leaving Marcus and the Petitioner alone for any period of time, but that he did know that eventually they split up.   (Tr. 147–148) Detective Petkiewitz, recalled, testified to the tattoo on the Petitioner's left hand.

Petitioner testified that he did not make any sale on either day to the undercover detective, and that the arrest came as a surprise to him while he was talking to a friend on the street.   Unfortunately defendant had a criminal record of considerable extent, including narcotics convictions; these were brought out by counsel on both sides and were—inevitably—prominent in both summations and in the charge.

Petitioner's closing argument was necessarily that the defendant had either been framed or was the victim of the possibly occasionally mistaken mass production procedure of using teams of informers, undercover detectives and back-up men to scour high crime areas for pretty drug peddlers.   Counsel made what he could of the fact that some identifying data might have been, but was not, included by the officers in their

notations made on the day of the transactions and then sealed up with the packets of alleged narcotics (Tr. 189–190). Then defense counsel argued (Tr. 190–191)

"The [back-up] officer said, 'I saw the unidentified male in conversation with the officer.' He doesn't know that the informant is supposed to be present but there may have been somebody else there. The first officer who made the so-called sale of narcotics, he says that his informant walked away. The other officer[s] said they don't recall whether he walked away or whether he stayed there. This informant becomes a witness. Again, in the law of narcotics, we are not permitted to know who he is. The Judge sustained all those objections and rightfully so. Here is a man who says that he is not guilty. He now cannot find the name of another witness to the transaction under the law of the narcotics cases. Suppose you knew his name and you wanted to subpoena him, he is registered, and bring him down and say tell us what happened. Did this happen or did you walk around and point out who you thought were drug addicts and drug sellers in this area and the police locked them up, looking to make informers out of them. We don't have benefit of the so-called confidential informant. You know that he is a witness at least to the extent that the so-called introduction, and as far as the other officers are concerned, he may have been there during the actual transaction because everybody walks away, and where do they walk away to according to Patrolman Bernstein, they walk on the other corner and make a sale."

The prosecution in its closing argument said (Tr. 197):

"On cross-examination when asked where was he an hour before his arrest, he [petitioner] recalled at that moment for the first time that he was with a girl but he couldn't remember her name and he couldn't remember her address.

"Now, talking about witnesses, if that witness exists, I would have liked to have heard from her but that witness was not produced."

Later, the prosecution argued

"The only possible witness for the defendant was not produced and you are entitled to draw the inference that if she were produced she would not tell the exact same story that the defendant would like her to tell.

"Mr. Brackly: I will have to object to that. The jury may draw no inference and again I will have to ask for a mistrial.

"THE COURT: Mr. Sussman that is the danger and that is what I have always cautioned counsel about, not to discuss the law. Leave that for the Judge because somewhere along the line, as surely as I am sitting here and looking right at you, Mr. Sussman, and Mr. Brackly, one of the lawyers is going to make an inaccurate or incomplete statement.

"Now, of course I will advise the jury fully upon that subject. I have asked the jurors not to accept any statement of law, whether Mr. Brackly made it or you made it, Mr. Sussman, and to accept the law only as I give it to them. They have indicated that they will do so. Go ahead, Mr. Sussman." (Tr. 202–203)

In its instructions on the law the Court emphasized to the jury that its task was to evaluate the testimony of the witnesses and in this context said (Tr. 209–210):

"A witness is a witness no matter who calls him, so that during this charge of the law, when I talk about witnesses in the case, that refers to witnesses called by both sides. The District Attorney representing the People of the State of New York, called a number of witnesses. He called police officers. He called chemists. The

defendant, on the other hand, called one witness. He, himself, took the witness stand and so these are all witnesses."

Speaking of the burden of proof resting on the prosecution the Court charged (Tr. 217)

"No defendant has to move forward with proof to establish that he is not guilty. On the contrary the people must move forward and establish beyond a reasonable doubt . . . the guilt of the defendant."

The Court charged the presumption of innocence. After the instructions were given the prosecution requested a charge ". . . that if there were a witness who was in the control of the defendant and is not produced by the defendant, then they are entitled to draw an inference—" (Tr. 258). The Court agreed to give that charge, but defense counsel objected to it on the ground that there was no evidence that the witness was under the defendant's control and the Court accordingly did not make that supplementary charge to the jury.

The jury returned their verdict an hour and a half after they received the case.

Putting aside procedural problems for the moment, the first question is whether the state had the rght to withhold the identity of the informer. *Roviaro v. United States*, 1957, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639, has become the starting point for more recent analyses and applications of the so-called informer privilege. *Roviaro* summarized the general propositions in the following language, 353 U.S. at 60–61, 77 S.Ct. at 627:

"The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged. Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

"A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." (Footnotes omitted)

In *Roviaro* the informer actually was the buyer in the heroin transaction; the offense was the knowing concealment and facilitation of the transportation of heroin after importation and with knowledge of its illicit importation. It was therefore easy for the Court to conclude that the informer might have been a helpful witness to the defense, and indeed was the only possible witness other than the defendant himself, who had a constitutional right not to testify, who could exculpate the defendant if he was innocent. Said the Court (353 U.S. at 64, 77 S.Ct. at 630):

"This is a case where the Government's informer was the sole participant, other than the accused, in the transaction charged. *The informer was the only witness in a position to amplify or contradict the testimony of government witnesses.*" (Emphasis supplied.)

The countless ' cases since *Roviaro* that have struggled with—and often against—its principle do not and certainly should not stray from the principle of requiring disclosure of the identity of the informer if, on the evidence, he is a potential witness who could contradict the testimony of prosecution witnesses—and, by the same token, could support it. If he is such a potential witness, then his testimony belongs in the case, and if his identity is called for by the Petitioner, manifestly it cannot be denied to him except in the service of some important interest, an interest that outweighs the defendant's interest in access to witnesses in the control of the prosecution.

# 438

The Sixth Amendment provides

"In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ."

*Washington v. Texas,* 1967, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019, found that right so fundamental that it was applicable to the state under the Fourteenth Amendment, and required the invalidation of a state statute, rooted in the common law, providing that persons charged as co-participants in the same crime could not testify for one another. As the Court there put it (388 U.S. 19, 87 S.Ct. 1923):

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies."

*Brady v. Maryland,* 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, again emphasizes the responsibility of the prosecution to make available to the defendant not merely evidence that might acquit him but evidence that could mitigate his punishment.

■ The narrow and precarious privilege of the prosecution to withhold the identity and the testimony of an informer competent to testify about a crime is one of the uglier aspects of an ugly business. Under the cases the privilege appears, as here, to be invoked by the bare assertion that the witness was a prosecution informer and that the prosecution is unwilling to disclose the name. No ground is advanced other than the bare assertion that the informer status exists. There is no requirement that the prosecution show that he is a reliable informer, that previous information furnished by him was borne out by investigation or trial and conviction; assertion wins the day; it defeats the constitutional right of the defendant to compulsory process unless he shows a very specific need for the alleged in-

former's testimony, that it is integral to a definite defense case.

■ While many cases have paid lipservice to *Roviaro's* warning that "no fixed rule with respect to disclosure is justifiable" (353 U.S. at 62, 77 S.Ct. at 628), the cases seem to ignore a more material *Roviaro* point, that disclosure is required by the fact that the informer is a witness who, uniquely, could either amplify or contradict the testimony of the prosecution witnesses (353 U.S. at 64, 77 S.Ct. 623). In the present case, from the substantive point of view, there was no warrant for recognizing the privilege because the prosecution's own testimony showed that the informer alone—apart from Petitioner—could contradict the police team. The prosecution was not required to and did not show or even assert that at the time of trial disclosure of the identity of the informer would jeopardize an ongoing investigation, or the personal safety of the informer, or the utility of the informer as a continued special employee of the prosecution.

The prosecution's case was made by the testimony of the undercover detective and the covering members of the police team. The testimony of public officers of blameless record is not easily impeached through cross-examination. Here, all three testified to the presence of the alleged informer at the beginning of the transactions, and, in substance, to the alleged informer's privity to the enforcement program. Uncertainty arose on the prosecution's own testimony concerning the presence of the alleged informer throughout the transaction, but that uncertainty left open not only the possibility that the informer was present throughout, but also the possibility that, if he stood apart from the final phase of the transaction, he was close enough to see whether anything passed from hand to hand after he stood aside.

Certainly the undercover detective testified to the telltale tattoo on the Petitioner's left hand, and the arresting

officer testified to it as well. The force of that evidence rests on acceptance as unqualifiedly true of the undercover detective's testimony on the point that a sale took place and that Petitioner made it; there was no doubt that the man arrested and tried had the tattoo.

The alleged informant if present to the extent that the prosecution's evidence indicated, would, if the police testimony was fully truthful, have been a merely cumulative prosecution witness. But if the critical testimony of the undercover detective was suspect, the alleged informer's testimony could have contradicted it along a half dozen imaginable paths not excluding the identity of the seller, failure to make a "buy" (for, of course, not every approach even to a known peddler results in a transaction; even peddlers run out of stock), refusal to deal (whether or not Petitioner was a peddler), recognition of the undercover officer as what he was, etc.

Failure to disclose the identity of the informer so that he could be interviewed and possibly called as a witness by the Petitioner left Petitioner only the alternatives of testifying or of relying solely upon his counsel's shrewd argument that the law of informer's privilege had denied the Petitioner his one opportunity to present his exculpation to the jury credibly. Petitioner's dilemma was impossible of resolution. Unless he testified and denied the transaction in some way, any argument based on the denial to him of the informer as a witness might be rhetorically interesting, but it would be practically empty. The jury could not but note that one witness not called was the Petitioner himself. There is ample reason to believe that juries give effect to the Fifth Amendment instruction, but the capacity of the human mind to subdue reason in obedience to the instruction would quite possibly be overtaxed when the defense seeks to argue the absence of a bystander witness under the control of the prosecution. Once the Petitioner did take the witness stand, his case became hopeless.

He had to admit in substance that, if he was not a peddler, he had at least been convicted of selling drugs or possessing them for sale in the past. The most he could offer was a dubious claim of something approaching alibi, provable through an uncalled witness whose name he said he did not know. That the instruction limited the peddler testimony to the matter of credibility would certainly help with conscientious jurors, but the instruction too closely resembles King Canute's command to the waves.

It is easy to say that Petitioner's case was hopeless in any event, and that the best he could have hoped for was to have produced a witness of probably dubious character who might impeach the credibility of three police officers or attempt to lend credibility to Petitioner's own testimony—for on the issue of identificaton, critical from the point of view of the informer's testimony, all three policemen were united. Nevertheless the failure to bring forward the identity of the alleged informer must be analyzed, not in terms of how the record in the end appeared, but, rather, in terms of how it might have appeared to the jury at the close of the trial had the informer been produced, and had his testimony been as favorable to Petitioner as reasonable analysis of the testimonial possibilities permitted.

The Attorney General in her excellent oral argument—the case has been well briefed and argued on both sides—gave strong emphasis to the guidelines afforded by the federal cases (all but intimating that the state rule places greater restrictions on the prosecution). *Cf. People v. Goggins,* 1974, 34 N.Y.2d 163, 356 N.Y.S.2d 571, 313 N.E.2d 41; *People v. Brooks,* 1974, 34 N.Y.2d 475, 358 N.Y.S.2d 395, 315 N.E.2d 460; Note *People v. McShann,* 1958, 50 Cal.2d 802, 330 P.2d 33. See *United States v. Ortega,* 2d Cir. 1972, 471 F.2d 1350, 1357–1359 (informer not present at any part of transaction); *United States v. Alvarez,* 9th Cir. 1973, 472 F.2d 111 (informer not participant nor, apparent-

ly, observer; no showng of how his testimony could exculpate); *United States v. Skeens*, 1971, 145 U.S.App.D.C. 404, 449 F.2d 1066, 1070–1071 (speculation to suppose that informer could support alibi defense where it was only speculation that informer could have been participant; ". . . disclosure . . . required where the informant was an active participant or was present at the scene of the crime"); *United States v. Russ*, 2d Cir. 1966, 362 F.2d 843 (informant present during good part of negotiation, absent from "closing"; "delicate balancing" called for; informant did not play central role; decision does not authorize "smug adherence to non-disclosure in all cases"). The argument implies that the New York Appellate Courts, in reviewing the present conviction, found compliance with the stricter state tests. This argument, however, is diluted by the fact that the very important *Goggins* case was not decided either in the Appellate Division or in the Court of Appeals until after the trial of the present case. It is also argued, in extension of the approach through the federal guidelines, that here the very nature of the defense rendered the informer irrelevant, for, it is argued, if there was no transaction, then the informer could not very well know anything or testify to anything useful. The suggestion is that the defense showing must put the informer in a time and place relevant to the transaction in issue and must suggest the basis on which the informer's testimony can contradict the prosecution testimony. That may be so where the case is going to the jury on a concession that something occurred at the time and place in question, and it has been urged that the informer can specifically deal with some aspect of the demonstrated transaction which exculpates the defendant. But in such a case as the present one, where the Petitioner's defense was that there had been no such transaction involving him, on the prosecution's evidence the informer was testimonially

qualified to support the Petitioner and contradict the police; the informer would also enable the Petitioner to stay off the witness stand, while at the same time impeaching the police testimony through the mouth of a member of their own team. That this expects unbelievably much in unlikely circumstances is hardly relevant. During a trial the armor of the presumption of innocence and the location of the burden of proof rule out even the most sensible skepticism about what a witness not called but shown to be present might say under oath.

■ It is concluded that if the Petitioner properly presented and preserved his right to an identification of the informer, he was substantively entitled to it as a matter of constitutional right.

■■ The record has been very fully stated above so that the procedural situation will be clear. The record indicates that the trial court was not in a position fairly and fully to evaluate the petitioner's claim for a disclosure of the informer's identity at the only time when the basic ground for it was presented. As the case evolved, there was no renewal of the informer point although it would have been possible to have fully argued and fairly decided the *Roviaro* point when the prosecution rested. When the Petitioner presented his closing argument about the law's silencing his witness—the informer—the District Attorney did not try to stop Petitioner nor was the Court asked to reopen the issue and reconsider the matter at that point. Reopening the evidence in the middle of a defendant's closing argument is not impossible nor improper, but it is certainly rare. When Petitioner's experienced counsel made the point in his closing argument, the experienced trial judge would certainly have speculated whether he had not simply been treated to an adoit exploitation of the known reluctance of district attorneys to disclose informers' identities. For all that the Court could tell,

Petitioner knew the informer and set a higher value on the right to make the closing argument than on taking the risk of either interviewing or calling the informer as a witness.

On the decided cases, at the time when the demand for the informer's name was made the Court was not in error in refusing to require disclosure. The failure to renew the point when trial developments put it in a different posture again precludes any fair argument of error on the Court's part. Hence the unanimous affirmance in the Appellate Division, despite the strongly argued brief and the ability of Counsel to cite the *Goggins* case in the Appellate Division, is readily understandable, as is the denial of leave to appeal to the Court of Appeals.

The present case cannot be treated as a post-conviction application for relief on matter *aliunde* the record made in the state court. The state court has not had an opportunity to pass on the issue presented in full form and with such evidentiary support for and against disclosure as may be available at this late date when, it may be, the District Attorney's interest in not disclosing the identity of the informer has expired. Since the present federal habeas corpus may not be used to determine an issue not passed on by the state court on a full record, the present petition must be denied without prejudice to such further proceedings as may appear to Petitioner to be appropriate in the state court. It is for that court, not this court, to pass initially on the question whether the *Roviaro-Goggins* point is procedurally available, and if so whether the Petitioner can in an evidentiary hearing make out a case for a new trial because of the failure to have had a necessary witness at the trial. It is accordingly

Ordered that the petition for a writ of habeas corpus is dismissed and the writ is denied.