Fuchsberg, J.
On this appeal by the People, the sole issue is whether the trial court properly denied defendant’s application for disclosure of the identity of a confidential informer.
After a trial by jury, the defendant was convicted on all counts of an indictment charging him with the sale and possession of dangerous drugs. The Appellate Division, Second Department (45 AD2d 1038), by a divided court, reversed the judgment and ordered a new trial so that the informer can be produced. For the reasons which follow, we believe that order should be reversed.[1]
*644 The identity of persons communicating information to prosecutorial agencies concerning the commission of crimes has long been accorded the privilege of confidentiality. Such communications have been encouraged as an aid to law enforcement and, in order to keep the sources of information from drying up, it has been found necessary to deny disclosure of the communicants in order to protect them from physical and other reprisals as well as the social stigma such activities engender in some. (8 Wigmore, Evidence [McNaughton rev, 1961], § 2374; Matter of Langert v Tenney 5 AD2d 586, app dsmd 5 NY2d 875; Donnelly, Judicial Control of Informants, Spies, Stool Pigeons and Agents Provocateurs, 60 Yale LJ 1091; see, generally, Accused’s Rights-Informer-Identity, Ann., 76 ALR2d 262.)
However, as with most privileges, there are limitations. A basic one is that it may not stand in the way of a fair trial. (McCormick, Evidence [2d ed], § 111, p 238.) Therefore, when, "taking into consideration the crime charged, the possible defenses, the possible significance of the informer’s testimony, and other relevant factors”, it appears that a fair trial would otherwise be imperiled, the privilege must yield. (Roviaro v United States, 353 US 53, 62.)
Recently, in People v Goggins (34 NY2d 163, cert den 419 US 1012) and People v Brown (34 NY2d 163, cert den 419 US 1012),[2] where we laid down guidelines which we reiterate with undiminished force today, we made it clear that the initial burden to compel disclosure is on the defendant. As Judge Wachtler there put it (p 169), "Bare assertions or conclusory allegations by a defendant that a witness is needed to establish his innocence will not suffice. Instead he must show a basis in fact to establish that his demand does not have an improper motive and is not merely an angling in desperation for possible weaknesses in the prosecution’s investigation” (citation omitted). On that basis, we concluded that an applicant’s burden may be met when weakness is found in the case against him, whether manifested during the People’s or the defendant’s case, or when the issue of identification appears to be a close one. A less restricted rule than that would result in too ready resort to demands for disclosure, not because a defendant has genuine reason to believe that production or *645 revelation of the identity of the informer would significantly aid rather than hurt his cause, but in pursuit of a stratagem to extract an unmerited dismissal from a prosecutor willing to pay that price to protect a reliable informer from exposure.
In the last analysis, "the truly crucial factor in every case is the relevance of the informer’s testimony to the guilt or innocence of the accused.” (Goggins, supra, p 170.) "[I]f upon the trial of a prisoner the judge should be of opinion that the disclosure of the name of the informant is necessary or right in order to show the prisoner’s innocence, then one public policy is in conflict with another public policy, and that which says that an innocent man is not to be condemned when his innocence can be proved is the policy that must prevail.” (Marks v Beyfus, 25 QBD 494, 498.)
With Goggins and Brown as guideposts, we now look to the proof here:
On April 19, 1972, Patrolman Daniel A. Pantano, a police officer with three years’ experience in narcotics law enforcement, drove to Knickerbocker Avenue and Stanhope Street in Brooklyn in the company of a confidential informer. The latter was officially registered as such with the New York City Police Department. Arriving at that location at 2:30 p.m., the two men got out of the car and the informer introduced Pantano to a man called "Indio”. "Indio” later turned out to be the defendant Pena. The informer told Pena that Pantano was a friend "looking [to buy narcotics].” Pena then said he was "doing” ("selling” in drug trade vernacular) "dimes” (packets of heroin retailing for $10). At this point the informer left; he was not present during any of the subsequent negotiations or at the time of the purchase itself.
Pantano testified that thereafter Pena sold him two "dimes”. The officer had taken careful note of Pena’s height, weight, features and other identifying physical characteristics, as well as of his mode of dress, all of which he had recorded shortly after the meeting. As soon as the transaction was completed the officer drove to Goodwin Place and Grove Street, a prearranged location nearby, to meet his backup team. There the drugs he had purchased were vouchered and sealed until they could be submitted for chemical analysis, which later revealed that they were indeed heroin.
A week later, on April 26, in broad daylight on a clear day, Pantano again met the man he had come to know as "Indio”, this time at Knickerbocker Avenue’s intersection with Mena *646 han Street in the same neighborhood. Pantano asked what he was "doing”. "Indio” replied that he was doing "half spoons” (an amount of heroin greater in both quantity and cost than a "dime”). After some conversation, Pantano handed over $45 and received three bags of heroin. Although the informant had accompanied Pantano , to the neighborhood this day too, no proof was offered to indicate that he was present at the initiating conversation, the negotiations, or the consummation of the sale itself. In short, he witnessed no phase of the transaction. Members of the undercover team, consisting of two other officers in plain clothes, did, however, observe the negotiations from a car parked only 45 feet away.
Fifteen minutes after the April 26 sale, both Pantano and his backup team each separately drove past the actual corner where the sale had taken place. "Indio” was still there. As Pantano went by, before any arrest was made, he used the radio in his own unmarked police car to confirm to the team that the man on the corner was the seller. He also personally observed the actual arrest in order to be positive that no mistake in identity occurred. He found no difficulty in identifying the man arrested, whose true name he later learned to be Pena, as the same individual from whom he had bought the drugs that day as well as on April 19.
At trial, after Patrolman Pantano described how he had originally been introduced to Pena by an informer, defense counsel requested that the trial court order disclosure of the informer’s name and address. The request was denied by the court, which, instead, thereafter conducted an in camera hearing concerning the existence of the informer, during which it solicited questions from counsel. At its conclusion the ruling against disclosure was adhered to. In giving identification testimony, Pantano did not rely on any information secured from the informer or any other outside source, but relied solely on his own observations. He was emphatic that Pena and "Indio” were one and the same person. His testimony was unshaken.
To contradict Pantano, Pena produced his aunt, who ran a shop for the sale of religious articles. Her testimony, viewed by the most objective of standards, appears, to say the least, to have been unconvincing. She appeared in the nature of an alibi witness and only with respect to the day of the second transaction. Her story was that Pena had been working in her store continually from early in the morning of that day up to *647 the very time of the arrest. She went on to testify that the arrest itself had occurred in her shop rather than in the street and further insisted that it had taken place on April 25 and not on April 26, though the correctness of the later date was to be established by official court and police records and is now conceded by the defense itself. Even if the discrepancy in dates is not treated as tell-tale evidence of unreliability, but ascribed instead to honest confusion or the paucity of the witness’ knowledge of English, whatever possible weight her testimony could have carried was drained away by the clear and uncontradicted rebuttal testimony of Patrolman Caracappa, the member of the backup team who had made the actual arrest. Caracappa, who, together with a third officer named Matthews, was an independent source of defendant’s identification with regard to the April 26 episode, explained that the aunt’s store was just off the corner where he had made the arrest and that Pena, subsequent to his arrest and prior to his removal from the scene for processing, had been taken in there when he had requested the officers to do so in order that he be able to make a "notification”. Even before Caracappa so testified, the aunt’s credibility had, for all practical purposes, already been destroyed. Her landlord, the witness Martino, put on the stand to corroborate her version of the store episode, had testified that, at the time Pena and the police were in the store, Martino and the aunt were engaged in a conversation about garbage in a backroom from which he could not see into the store. It is not surprising then, that neither the aunt, Pena, or anyone else attempted to meet the Caracappa rebuttal.
Thus, the situation here differs from that in Goggins as day from night. In Goggins, the purchasing officer had given a sketchy description of the defendant to his backup team; here Pantano’s was explicit. In Goggins, the officer’s identification resulted from observations made in a dimly-lit bar; here on both occasions they took place face to face in broad daylight in clear weather. In Goggins, there was no adequate verification that the right individual had been arrested; here Pantano did not drive away until he was sure the right man had been arrested. In Goggins, the arrest was not made until four days after the second drug sale and, in fact, no clear identification was attempted until more than a year later; here it was made within fifteen minutes. In Goggins, direct and creditable evidence was presented to support his claim of innocence; here *648 even the majority of the Appellate Division characterized defendant’s scant and contradictory proof as "weak”. (45 AD2d 1038, 1039, supra.) In Goggins, there was both a "plausible issue as to guilt and less than troublefree identification testimony” (34 NY2d 163, 173, supra), and so disclosure was held to be required on either ground; here guilt was clear and the identification, other than by the completely discredited April 25-April 26 alibi attempt, went completely unquestioned, so that disclosure was called for on neither ground.
In contrast, Brown does bear resemblance to the present case. In Brown, the officer who purchased the drugs made the identification almost immediately after arrest as the defendant was being brought into the police station for booking; here the identification was at least as immediate. In Brown, "the defendant has failed to focus on any weak point in the prosecutor’s case or closely contested issue of fact which might be resolved by disclosure of the informant’s identity” (34 NY2d 163, 172, supra); here the informer was not present when the sale was transacted on April 19 (a date as to which Pena offered no contravening proof at all, obviously because of the very limited and tangential role the informer played in the anticipatory events of that day), not to mention the fact that the informer had even less, in fact nothing, to do with the sale of April 26. And, both here and in Brown, in holding an in camera hearing, the court took the extra precaution of assuring itself that the informer truly existed and that the protection of the confidentiality of his identity was not calculated to deprive the defendant of a fair trial. Indeed, the Brown court’s description of the essential facts in that case is such a mirror image of those here that it bears repeating verbatim (p 171):
"Brown was convicted of selling drugs on two occasions to an undercover police officer. On the first occasion an informer took the officer to the defendant’s apartment and told the defendant 'this is my friend, take care of him’. The informer left and the defendant sold cocaine to the officer. On the second occasion the informer waited downstairs while the officer returned to the defendant’s apartment and once again purchased cocaine.
"On the night of the arrest, the officer waited in a car while his backup team escorted defendant from his apartment. The undercover officer viewed defendant through binoculars, and determined he was the person who had sold the officer the *649 drugs. By a prearranged signal, the undercover officer * * * reconfirmed his initial identification of defendant by viewing him from approximately 30 feet away when he was being brought into the precinct house to be booked.”
It follows that the informer’s testimony here, as in Brown, was not relevant to the guilt or innocence of the defendant in any pragmatic sense. Mere conjecture, such as the inchoate "possibilities” defendant urged upon us, was not enough, all the more so under the facts in this case.
Accordingly, the order appealed from should be reversed and the cause remitted to the Appellate Division for determination of the facts in conformity with CPL 470.40 (subd 2, par [b]).
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cook concur.
Order reversed and case remitted to the Appellate Division, Second Department, for further proceedings in accordance with the opinion herein.

. The original order of the Appellate Division was resettled to provide that the reversal was on the law alone. (See CPL 450.90, subd 2, par [a].)

. People v Goggins and People v Brown, which were decided simultaneously in joint opinions, appear in joint citations.