**Domingo PENA, Petitioner,**

v.

**Eugene LeFERVE, Superintendent of the Clinton Correctional Facility, Respondent.**

No. 76 C 901.

United States District Court, E. D. New York.

Sept. 14, 1976.

Domingo Pena, pro se.

Louis J. Lefkowitz, Atty. Gen. of State of N.Y., by Kevin J. McKay, Deputy Asst. Atty. Gen., for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Petitioner, acting *pro se,* has petitioned for a writ of *habeas corpus* seeking release from his incarceration pursuant to an allegedly unconstitutional judgment of the New York Supreme Court, Kings County. Title 28 U.S.C. § 2241 *et seq.* Petitioner, currently confined in the Clinton Correctional Facility, was convicted, after a jury trial, of criminal sale of a dangerous drug in the third degree (two counts), criminal possession of a dangerous drug in the fourth degree (two counts), and criminal possession of a dangerous drug in the sixth degree (two counts). He was sentenced on December 28, 1972 to concurrent prison sentences of five to fifteen years, twenty eight months to seven years, and one year, respectively.

### I—FACTS

The following facts are not in dispute. At his trial, petitioner was identified by Patrolman Daniel A. Pantano as the individual who had twice sold him heroin. Pantano, an undercover police officer with three years experience with the Police Department's Narcotics Division, testified that on April 19, 1972 at about 2:30 P.M., he met with a confidential informant and a police backup team (Officers Caracappa and Mathews) at the corner of Knickerbocker Avenue and Stanhope Street in Brooklyn. It was at this location that Pantano first met petitioner, known only by his nickname as "Indio." Pantano, at this time, was dressed in dungarees, an army fatigue shirt and his hair reached to his shoulders.

Pantano and the informant pulled up in Pantano's car. The informant introduced Pantano to "Indio" Pena and told him that Pantano was a friend of his and that he was "looking" [to purchase narcotic drugs]. Petitioner indicated that he was doing ["selling" in drug trade vernacular] "dimes"

[bags or packets of heroin retailing for $10.]. (Tr., pp. 60–61). The informant then left the area, and petitioner and Pantano were alone. (Tr., p. 72).

Pantano requested and was sold two packets of heroin in exchange for $20. Pantano described the seller as a male, white, Puerto Rican wearing a black trench coat and black pants (identifying characteristics he had recorded shortly after the meeting). Pantano then drove to a prearranged site and met with his backup team. The drugs he had purchased were vouchered and sealed until they could be chemically analyzed, which later revealed that they were indeed heroin. This first undercover purchase was not consummated nor did the actual transfer take place in the presence of the informant. (Tr., p. 72).

The following week, on April 26, 1972 at about 3:00 P.M., in broad daylight on a clear day, Pantano went to the intersection of Knickerbocker Avenue and Menahan Street in Brooklyn. On this occasion, Pantano approached petitioner and asked "what he was doing." (Tr., p. 74). Pena replied that he was doing "half spoons" [an amount of heroin greater in both quantity and cost than a mere "dime bag"]. After some conversation, Pantano turned over $45 and was given three glassine packets containing heroin. (Tr., pp. 76, 83). Although the informant had accompanied Pantano to the neighborhood this day too, no proof was offered to indicate that he was present at the initiating conversation, the negotiations, or the consummation of the sale itself.

Approximately fifteen minutes later, Pantano and his backup team drove separately past the corner where the sale had just been made. "Indio" was still on the corner. Pantano radioed his backup team and identified the man on the corner, Pena, as the seller. Officers Caracappa and Mathews pulled over and arrested petitioner. Pantano personally observed the actual arrest in order to be positive that no mistake in identity occurred.

On cross-examination, it was indicated that the informant introduced the prospective buyer (Pantano) to a seller of drugs (Pena) and merely stated, "This [Pantano] is my friend." (Tr., p. 97). At this point, defense counsel requested that Pantano name the informant and his address, to which the Assistant District Attorney objected. The court declined to force the prosecution to disclose the identity of the informant. The court conducted an *in camera* examination of Officer Pantano concerning the existence of the informer, and after satisfying itself that the informer did exist and was registered with the Police Department as a confidential informant, adhered to its ruling against disclosure of the informant's identity. In giving identification testimony, Pantano did not rely on any information secured from the informer or any other outside source, but relied solely on his own observations.

Patrolman Steven Caracappa of the Narcotics Division, an undercover member of Pantano's backup team, testified that on April 19, 1972, at the time of the first sale, he was about a block away from the site of the sale. Although acknowledging that he did not witness the sale, he did testify that he was shown the purchased heroin shortly after the transaction took place. (Tr., pp. 154–157).

On the afternoon of April 26, 1972, Caracappa again served in a backup capacity to Pantano. The witness observed Pantano on the corner of Knickerbocker and Menahan Streets in conversation with petitioner for some five minutes. Shortly after the second sale, Pantano again met with the backup team where the fruits of the second sale were displayed, signed and sealed.

Caracappa, after Pantano's radioed message, placed Pena under arrest on the corner of Knickerbocker and Menahan within 30 minutes after this second drug sale.

To contradict Pantano, petitioner's aunt, Hilda Pena, testified that on April 25, 1972, her nephew had been in her religious articles store since 9:30 A.M. and was behind the counter when, at about 3:30 P.M. Patrolmen Caracappa and Mathews entered the store and asked "where is the gun." (Tr., p. 202). After talking to her, they

allegedly searched the store and then pushed petitioner outside.

Caracappa was recalled to rebut Hilda Pena's testimony. Caracappa testified that after arresting petitioner on April 26, Pena asked if he could enter the store to make a "notification." Caracappa and Mathews accompanied the petitioner inside the store and stayed for about two minutes before they proceeded to the 83rd Precinct for routine arrest processing.

On appeal to the Appellate Division, Second Department, petitioner argued that the trial judge's ruling upholding the prosecutor's objection to disclosure of the informant's identity was erroneous. Pena relied on *People v. Goggins,* 34 N.Y.2d 163, 356 N.Y.S.2d 571, 313 N.E.2d 41 (1974), *cert. denied,* 419 U.S. 1012, 95 S.Ct. 332, 42 L.Ed.2d 286 (1974), and *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), in which the Supreme Court held that "the fundamental requirements of fairness" require that an informant's identity must be disclosed when such disclosure "is relevant and helpful to the defense of the accused, or is essential to a fair determination of a cause," *id.* at 60–61, 77 S.Ct. at 628, and that failure of the trial judge to order such disclosure upon request of the defendant at his trial was reversible error. The Appellate Division, agreeing with petitioner, reversed and remanded the case for a new trial because the informant, although not a participant in the crime or an eyewitness, had helped to set the stage for the transaction by introducing Pantano to petitioner. See *People v. Pena,* 45 App.Div.2d 1038, 357 N.Y.S.2d 899 (2d Dept. 1974).

On appeal by the People to the New York Court of Appeals, the order of the Appellate Division was reversed and petitioner's conviction upheld. *See People v. Pena,* 37 N.Y.2d 642, 376 N.Y.S.2d 452, 339 N.E.2d 149 (1975). After acknowledging that the privilege of confidentially of persons communicating information to prosecutorial agencies was limited by the need to ensure

that a defendant receives a fair trial, the court reiterated the guidelines set down in *Goggins, supra,* and *People v. Brown,* 34 N.Y.2d 163, 365 N.Y.S.2d 571, 313 N.E.2d 41 (1974), cert. denied, 419 U.S. 1012, 95 S.Ct. 332, 42 L.Ed.2d 286.[1] *Goggins* and *Brown,* the court stated, stand for the proposition "that the initial burden to compel disclosure is on the defendant," and that:

> " 'Bare assertions or conclusory allegations by a defendant that a witness is needed to establish his innocence will not suffice. Instead he must show a basis in fact to establish that his demand does not have an improper motive and is not merely an angling in desperation for possible weaknesses in the prosecution's investigation' (citation omitted). On that basis, we conclude that an applicant's burden may be met when weakness is found in the case against him, whether manifested during the People's or the defendant's case, or when the issue of identification appears to be a close one. A less restricted rule than that would result in too ready resort to demands for disclosure, not because a defendant has genuine reason to believe that production or revelation of the identity of the informer would significantly aid rather than hurt his cause, but in pursuit of a stratagem to extract an unmerited dismissal from a prosecutor willing to pay that price to protect a reliable informer from exposure.
>
> "In the last analysis, 'the truly crucial factor in every case is the relevance of the informer's testimony to the guilt or innocence of the accused.' " *People v. Pena, supra,* at 644–45, 376 N.Y.S.2d at 454, 339 N.E.2d at 151, quoting *People v. Goggins, supra,* 34 N.Y.2d at 169–70, 356 N.Y.S.2d 571, 313 N.E.2d 41.

The Court of Appeals distinguished *Goggins* and *Brown,* relied on by the Appellate Division, pointing out that there was no direct and credible evidence to support Pena's innocence and that there had been a "less

---

1. *Goggins* and *Brown,* which were decided simultaneously in joint opinions, appear in joint citations.

than troublefree identification" in the *Goggins* case, whereas, based on the trial testimony, there was no question of Pena's identification.[2]

Petitioner now seeks a writ of *habeas corpus,* asserting that as a matter of due process of law he was entitled to the name of the informant. Before deciding that question, however, it is necessary to consider whether petitioner has properly exhausted his State court remedies, as required by 28 U.S.C. § 2254(b).

## II—EXHAUSTION OF STATE COURT REMEDIES

■ Title 28 U.S.C. § 2254(b), requires that a State prisoner seeking a federal writ of *habeas corpus* must first demonstrate that he "has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." As the discussion of the procedural history of petitioner's case indicates, the identical ground urged on this Court has been presented to the highest New York State courts. Consequently, petitioner has exhausted his available State court remedies and his claim is ripe for consideration by this Court. *See Picard v. Connor*, 404 U.S. 270, 91 S.Ct. 1620, 29 L.Ed.2d 110 (1971).

---

2. *See Pena, supra,* 37 N.Y.2d at 647–49, 376 N.Y.S.2d at 456, 339 N.E.2d at 153:

"In *Goggins,* the purchasing officer had given a sketchy description of the defendant to his backup team; here Pantano's was explicit. In *Goggins,* the officer's identification resulted from observations made in a dimly-lit bar; here on both occasions they took place face to face in broad daylight in clear weather. In *Goggins,* there was no adequate verification that the right individual had been arrested; here Pantano did not drive away until he was sure the right man had been arrested. In *Goggins,* the arrest was not made until four days after the second drug sale and, in fact, no clear identification was attempted until more than a year later; here it was made within fifteen minutes. In *Goggins,* direct and credible evidence was presented to support his claim of innocence; here even the majority of the Appellate Division characterized defendant's scant and contradictory proof as 'weak'. (45 A.D.2d 1038, 1039, 357 N.Y.S.2d 899, 900, *supra.*) In *Goggins,* there was both a 'plausible issue as to guilt and less than trouble-free identification testimony' (34 N.Y.2d 163, 173, 351 N.Y.S.2d 571, 578, 313 N.E.2d 41, 46, *supra* ), and so disclosure was held to be required on either ground; here guilt was clear and the identification, other than by the completely discredited April 25–April 26 alibi attempt, went completely unquestioned, so that disclosure was called for on neither ground.

In contrast, *Brown* does bear resemblance to the present case. In *Brown,* the officer who purchased the drugs made the identification almost immediately after arrest as the defendant was being brought into the police station for booking; here the identification was at least as immediate. In *Brown,* 'the defendant has failed to focus on any weak point in the prosecutor's case or closely contested issue of fact which might be resolved by disclosure of the informant's identity' (34 N.Y.2d 163, 172, 356 N.Y.S.2d 571, 578, 313 N.E.2d 41, 46, *supra* ); here the informer was not present when the sale was transacted on April 19 (a date as to which Pena offered no contravening proof at all, obviously because of the very limited and tangential role the informer played in the anticipatory events of that day), not to mention the fact that the informer had even less, in fact nothing, to do with the sale of April 26. And, both here and in *Brown,* in holding an *in camera* hearing, the court took the extra precaution of assuring itself that the informer truly existed and that the protection of the confidentiality of his identity was not calculated to deprive the defendant of a fair trial. Indeed, the *Brown* court's description of the essential facts in that case is such a mirror image of those here that it bears repeating verbatim (p. 171, 356 N.Y.S.2d 571, p. 576, 313 N.E.2d 41, p. 45):

'Brown was convicted of selling drugs on two occasions to an undercover police officer. On the first occasion an informer took the officer to the defendant's apartment and told the defendant "this is my friend, take care of him". The informer left and the defendant sold cocaine to the officer. On the second occasion the informer waited downstairs while the officer returned to the defendant's apartment and once again purchased cocaine.

'On the night of the arrest, the officer waited in a car while his backup team escorted the defendant from his apartment. The undercover officer viewed the defendant through binoculars, and determined he was the person who had sold the officer the drugs. By a prearranged signal, the undercover officer \* \* \* reconfirmed his initial identification of defendant by viewing him from approximately 30 feet away when he was being brought into the precinct house to be booked.' "

116

## III—THE CONSTITUTIONAL ISSUE

The key issue in this case is the interpretation by the New York Court of Appeals of *Roviaro v. United States, supra,* in *People v. Goggins, supra.* In *Roviaro,* the United States Supreme Court held that "fundamental requirements of fairness" dictate disclosure of an informant's identity in certain circumstances, 353 U.S. at 60–61, 77 S.Ct. 623, but nowhere in that decision did the Court explicitly state that such disclosure was required by a specific provision of the Constitution.

Indeed, in *McCray v. Illinois,* 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), the Supreme Court discussed its holding in *Roviaro* in terms of the formulation of "evidentiary rules for federal criminal trials." Id., at 311, 87 S.Ct. at 1062. An issue crucial to petitioner's case is thus presented: if disclosure of the informant's identity under the circumstances discussed in *Roviaro* is solely a matter of enforcement of "evidentiary rules for federal criminal trials," then the ruling of the State trial judge, assuming *arguendo* it was error, was at best an error of State evidentiary law and as such does not rise to the level of a constitutional ground upon which petitioner may apply for a federal writ of *habeas corpus.* 28 U.S.C. § 2254(a). *See* also *Buchalter v. New York,* 319 U.S. 427, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943); *Schaefer v. Leone,* 443 F.2d 182 (2d Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 277, 30 L.Ed.2d 251 (1971). However, if the disclosure of the informant's identity was dictated by constitutional requirements, then the failure to disclose, if *Roviaro*'s teachings so required,

would entitle Pena to a granting of the writ.

The language used in *Roviaro,* "the fundamental requirements of fairness," strongly dictate that the Court was speaking in terms of a constitutional guarantee. The cases are legion that refer to "fundamental fairness" as the touchstone of due process of law.[3] Few opinions that have applied the *Roviaro* holding, however, have expressed a conclusion as to whether the necessity of disclosure at trial may be found in the requirements of the Constitution or in the power of the Supreme Court to prescribe evidentiary rules for the lower federal courts. In the Second Circuit, the *Roviaro* disclosure requirement was often acknowledged but seldom subjected to close analysis.[4]

Other federal courts have assumed that the requirement of disclosure in particular circumstances is rooted in the constitutional guarantee of a "fundamentally fair" trial. *See United States v. Emory,* 468 F.2d 1017, 1021–22 (8th Cir. 1972); *Burwell v. Teets,* 245 F.2d 154, 165 (9th Cir. 1957), *cert. denied,* 355 U.S. 896, 78 S.Ct. 271, 2 L.Ed.2d 194, *reh'g denied,* 355 U.S. 928, 78 S.Ct. 385, 2 L.Ed.2d 358 (1958); *Melendez v. Superintendent,* 399 F.Supp. 430 (E.D.N.Y.1975); *United States v. Barbera,* 213 F.Supp. 923 (S.D.N.Y.1963); *United States v. Powell,* 156 F.Supp. 526 (N.D.Cal.1957). At least three times *Roviaro* has been used as foundation for granting a writ of *habeas corpus* for a State prisoner, further affirming the position that the case involved constitutional guarantees. *See United States ex rel. Drew v. Myers,* 327 F.2d 174 (3d Cir.), *cert.*

3. "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice." *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941); "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *See Lyons v. Oklahoma,* 322 U.S. 596, 605, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944); *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *Gideon v. Wainwright,* 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Washington v. Texas,* 388

U.S. 14, 17–18, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

4. *See, e. g., United States v. White,* 324 F.2d 814 (2d Cir. 1963); *United States v. Cimino,* 321 F.2d 509 (2d Cir. 1963), *cert. denied sub. nom., D'Ercole v. United States,* 375 U.S. 967, 84 S.Ct. 486, 11 L.Ed.2d 416 (1964); *United States v. Holiday,* 319 F.2d 775 (2d Cir. 1963). *But see United States ex rel. Coffey v. Fay,* 344 F.2d 625, 631 n. 4 (2d Cir. 1965), *rev'g* 234 F.Supp. 543 (S.D.N.Y.1964), on remand 242 F.Supp. 382 (S.D.N.Y.1965), *aff'd,* 356 F.2d 460 (2d Cir. 1966), *cert. denied,* 386 U.S. 1014, 87 S.Ct. 1350, 18 L.Ed.2d 450 (1967).

*denied*, 379 U.S. 847, 85 S.Ct. 88, 13 L.Ed.2d 52 (1964); *Hawkins v. Robinson*, 367 F.Supp. 1025 (D.Conn.1973); *Hernandez v. Nelson*, 298 F.Supp. 682 (N.D.Cal.1968), *aff'd*, 411 F.2d 619 (9th Cir. 1969). On the other hand, the Sixth Circuit in *Phillips v. Cardwell*, 482 F.2d 1348, 1349 (6th Cir. 1973) (per curiam), has expressed doubt that a *Roviaro* claim is cognizable in a State prisoner *habeas corpus* proceeding.

■ An analysis of the circumstances in *Roviaro* leads to the conclusion that interests of constitutional magnitude, not simply evidentiary errors, may well have been at issue in that case. *Roviaro*, involved a conviction for possession and transportation of heroin. There, a confidential informant picked up the defendant in his car and the drug transaction occurred while the informer and defendant were alone in the car. While the transaction was being consummated, an undercover agent was hidden in the trunk of the informer's automobile and overheard part of the conversation between the informer and defendant. However, neither the concealed agent nor other agents who followed the informer's car had observed the actual transaction and consummation of the alleged drug sale. The Supreme Court noted that, considering the crime charged, identification of the informant may have been crucial to the preparation and conduct of Roviaro's defense in several ways. First, Roviaro believed that "he and John Doe [the informer] were alone and unobserved during the crucial occurrence for which he was indicted. Unless [Roviaro] waived his constitutional right not to take the stand in his own defense, John Doe was his one material witness." 353 U.S., at 64, 77 S.Ct. at 629. Second, Doe might have enabled Roviaro to establish a defense: "Doe had helped to set up the criminal occurrence and had played a prominent part in it. His testimony might have disclosed an entrapment." *Id.* Alternatively, he "might have thrown doubt upon petitioner's identity or on the identity of the package [of drugs]." *Id.* Moreover, Doe's testimony may have cast doubt on the existence of a critical element of the crime: "He was the only witness who might have

testified to petitioner's possible lack of knowledge of the contents of the package that he 'transported' from the tree to John Doe's car." *Id.* Finally, the Court noted,

> "the Government's use against petitioner of his conversation with John Doe while riding in Doe's car particularly emphasizes the unfairness of the nondisclosure in this case. The only person, other than petitioner himself, who could controvert, explain or amplify Bryson's [concealed agent] report of this important conversation was John Doe. Contradiction or amplification might have borne upon petitioner's knowledge of the contents of the package or might have tended to show an entrapment." *Id.*

Therefore, it is probable that the Supreme Court was concerned not merely with the formulation of a rule of evidence in federal criminal trials: at stake was the basic fairness of the proceedings against Roviaro. And, the denial of basic fairness in a criminal proceeding is a "violation of the Constitution . . . of the United States." 28 U.S.C. § 2254(a). Furthermore, where the very integrity of the fact finding process is at issue, *i. e.*, in the presentation or exclusion of evidence directly relating to an accused's innocence or guilt at trial, the Supreme Court has determined the accused's "fundamental" rights to be of constitutional origin. *See Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

However, the Court went on in *Roviaro* to point out that their pronouncement was not a blanket rule requiring disclosure of a confidential informant's identity whenever a defendant demanded it:

> "We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the pos-

sible defenses, the possible significance of the informer's testimony, and other relevant factors." 353 U.S., at 62, 77 S.Ct. at 629.

■ Thus, having concluded that petitioner's claim is in all probability one cognizable in a federal *habeas corpus* proceeding, the question remains as to whether petitioner's constitutional rights were violated by the trial court's refusal to force disclosure of the informant's identity. As is apparent from the facts, the informer played a minimal role at best in the criminal transaction. Other than his introduction of Officer Pantano to "Indio", the informer neither participated in the drug sale nor observed the transactions or consummation of the criminal activity. In fact, other than an acknowledgement that the informant was in the neighborhood, there was no testimony linking him to the dealings on the second date. In *Rugendorf v. United States*, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887, *reh'g denied*, 377 U.S. 940, 84 S.Ct. 1330, 12 L.Ed.2d 303 (1964), the Supreme Court refused to extend the *Roviaro* holding to a case where the informant had not "played a direct and prominent part, as the sole participant with the accused, in the very offense for which the latter was convicted." *Id.*, at 534, 84 S.Ct. at 829. In *United States v. Russ*, 362 F.2d 843 (2d Cir. 1966), the Court of Appeals rejected a *Roviaro* argument on facts strikingly similar to petitioner's case. There, the Government's "special employee",

". . . merely introduced [the agent] to Russ and, as we have noted, wandered away to purchase some food while preliminary negotiations were in progress. And, even of more significance, when [the agent] and Russ consummated the sale on a public street corner in full view of Agent Miller, the informer remained inside the Most Bar and did not even witness the most crucial step in the offense." *Id.*, at 845.

The Court also emphasized in *Russ*, that there was no issue of entrapment and that the identification of the defendant was most credible. Each of these factors, although not decisive when considered separately, taken together led the Court to conclude that Russ had not been denied a fair trial by the nondisclosure of the informant's identity.

In this case as well, when the factors are considered together: the minimal role the informer played, the strong identification testimony, the lack of any allegation of entrapment, and the paucity of petitioner's alibi defense, lead to the conclusion that the trial court properly denied petitioner's request for disclosure. Accordingly, it is

ORDERED that the writ of *habeas corpus* be denied and the petition dismissed.